UNITED STATES of America, Appellee,

v.

Vincent E. MARINO,
Defendant-Appellant.

Docket 80–1213.

United States Court of Appeals,
Second Circuit.

Argued Sept. 30, 1980.

Decided Jan. 22, 1981.

Rehearing and Rehearing In Banc
Denied March 18, 1981.

Harold R. Tyler, Jr., Patterson, Belknap, Webb & Tyler, New York City, Frederick T. Davis, and Kenneth A. Caruso, New York City, of counsel, for defendant-appellant.

Scott W. Muller, Asst. U. S. Atty., New York City (John S. Martin, Jr., U. S. Atty. for the S. D. New York, Atty. Mary Jo White, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before OAKES and NEWMAN, Circuit Judges, and COFFRIN, District Judge.*

COFFRIN, District Judge:

Vincent E. Marino appeals from a judgment of conviction entered on May 22, 1980, after a three-week jury trial before Judge Stewart in the United States District Court for the Southern District of New York. The jury found Marino guilty on all four counts of an indictment charging him with conspiracy, 18 U.S.C. § 371, and aiding and abetting the embezzlement of funds of a common carrier, 18 U.S.C. §§ 2, 660. Judge Stewart sentenced Marino to a total of one year and one day's imprisonment.[1]

---

* Honorable Albert W. Coffrin, United States District Judge for the District of Vermont, sitting by designation.

1. Judge Stewart declared a mistrial of the case against Marino's co-defendant William O'Don-

In arguing that his conviction should be reversed, Marino maintains that the provisions of 18 U.S.C. § 660 do not apply to the acts with which he was charged. In this connection, he contends that deficiencies in the indictment, the proof at trial, and the charge to the jury each provide grounds for reversal. He also objects to the admission of certain evidence at trial on the grounds of irrelevance, prejudice, and unfair surprise.

Marino was convicted for his part in an overbilling and kickback scheme involving two executives of the steamship company, Prudential Grace Lines, Inc. (Prudential). Prudential is a large American flag carrier engaged exclusively in foreign commerce. The executives of Prudential involved in the scheme were Keith Nelson, Director of Intermodal [container] Operations, and John Marano, an officer of the corporation and Executive-Vice President in charge of operations. At the time of the scheme, Marino was president and part owner of Marine Repair Services, Inc. (Marine Repair). Marine Repair is a Staten Island company engaged in the repair of maritime equipment including containers and the chassis on which the containers rest when they are carrying goods by land.

The kickback scheme began in July 1974 when Nelson decided to seek the repair and modification of approximately sixty-five of Prudential's container chassis in order to bring them into compliance with industry standards. Nelson conferred with Marano and then obtained bids for the work from Marine Repair and other companies. Nelson and Marano accepted Marine Repair's bid for the work even though the bid was substantially higher than others which Nelson received. The evidence showed that Marino agreed to pay $900 per chassis in roughly equal shares to Marano, Nelson, and Anthony Scotto of the International Longshoremen's Union.[2]

Work began on the chassis in October 1974 and lasted until July 1975. During that period Marine modified approximately fifty-two chassis. Marine received payment for the work both through invoices submitted directly to Nelson for special rush payment and through a second set of invoices apparently submitted for the same work through routine billing channels. Nelson, Marano, and allegedly Scotto each received kickback payments; Nelson's payments alone exceeded $13,000. Nelson later pled guilty to tax charges arising from the unreported receipt of other kickback payments not involved in this case.

I. Applicability of 18 U.S.C. § 660.

18 U.S.C. § 660 is directed at the theft or embezzlement of funds of a common carrier by an executive or employee. The section provides in part that

> [w]hoever, being a president, director, officer or manager of any firm, association, or corporation engaged in commerce as a common carrier, or whoever, being an employee of such common carrier riding in or upon any railroad car, motortruck, steamboat, vessel, aircraft or other vehicle of such carrier moving in interstate commerce, embezzles, steals, abstracts, or willfully misapplies, or willfully permits to be misapplied, any of the moneys, funds, credits, securities, property, or assets of such firm, association, or corporation arising or accruing from, or used in, such commerce, in whole or in part, or willfully or knowingly converts the same to his own use or to the use of another, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

Marino raises several objections to his conviction under section 660. First, he claims

nel after the jury was unable to reach a verdict concerning him. Criminal proceedings against O'Donnel were later terminated with the entry of a *nolle prosequi* order.

2. Marino was originally indicted as a co-defendant with Anthony Anastasio, Anthony Scotto, and Joseph Lacqua. The indictment

charged Marino with violations of 29 U.S.C. § 186(a). The trial of Scotto and Anastasio was severed, Lacqua was also tried separately, and in December 1979 the government replaced the original counts against Marino with the four embezzlement and conspiracy counts on which he and O'Donnel were ultimately tried.

that the indictment, proof at trial, and charge to the jury each failed to satisfy the statutory requirement that the embezzled funds arise or accrue from commerce. This argument has two parts. Marino argues that section 660 applies to the embezzlement of funds derived from transactions in interstate but not foreign commerce. He also contends that the statute requires that the embezzled funds derive directly from some specific, identifiable transaction in interstate commerce. Finally, Marino claims that the proof and charge to the jury did not satisfy the requirement that one of the principals in the scheme be an officer or manager of the common carrier.

## A. Foreign Commerce

■ Section 660 clearly reaches the embezzlement by executives of funds accruing from either foreign or interstate commerce. When section 660 first appeared as section 9 of the Clayton Act in 1914, it applied only to executives and managers of firms "engaged in commerce as a common carrier" who embezzle money "arising or accruing from, or used in, such commerce." Clayton Act, ch. 323, § 9, 38 Stat. 733 (1914). The Clayton Act defines commerce (in 1914 as well as today) to include *both* foreign and interstate commerce. 15 U.S.C. § 12(a). This broad definition of commerce placed the embezzlement of funds arising or accruing from foreign as well as from interstate commerce within the scope of the 1914 version of section 660.

In 1940, section 9 of the Clayton Act became section 412 of Title 18. In 1948, Congress combined section 412 with 18 U.S.C. § 409(a)5, a provision aimed at combatting thefts of property from interstate shipments by employees of the carrier, in order to create section 660. The only reference in section 660 to *interstate* commerce comes from section 409(a)5. Employees prosecuted under section 409(a)5 and now under section 660 must be accused of stealing property while riding on a vehicle "moving in interstate commerce."

To apply the interstate movement requirement to the executive provision of section 660, however, would be plainly incor-

rect. Congress did not intend the re-codification of title 18 in 1948 to effect substantive changes in the scope and coverage of existing criminal statutes like those combined to form the modern section 660. *United States v. Cook*, 384 U.S. 257, 260, 86 S.Ct. 1412, 1413, 16 L.Ed.2d 516 (1966). From 1914 to the present date, therefore, section 660 and its predecessors have applied to the embezzlement by executives of funds arising from either foreign or interstate commerce.

## B. "Arising or accruing from, or used in, such commerce."

Marino also contends that section 660 requires that the embezzled funds must not only derive from interstate commerce but from an identifiable transaction in interstate commerce as well. Marino argues that the requirement that the officer or manager embezzle funds "arising or accruing from, or used in, such commerce, in whole or in part" cannot have been satisfied in the indictment, proof, or jury charge because the fraudulent transactions were carried out entirely within the state of New York. He argues further that the funds used to make the fraudulent overpayments to Marine Repair were not the proceeds of an identifiable transaction in interstate commerce and thus failed to bring the fraud within the scope of section 660. In short, Marino's position is that the 'arising' requirement means either that the perpetration of the fraud must cross state lines or that the embezzled funds must be traced to some specific interstate transaction.

In divining the intended effect of the 'arising' requirement, the court looks to the legislative debate preceding the passage of section 9 of the Clayton Act in 1914. Section 9 as first proposed contained no 'arising' requirement at all. Sharp disagreement then broke out on the floor of the Senate concerning the constitutionality of the bill. Opponents of the measure viewed it as an invasion of an area of the criminal law traditionally left to the states. As Senator Stone of Missouri observed,

The power of the Federal Government in the mere regulation of interstate commerce is wide and ample; but we are going to do now what we have not done before—we are going to authorize the Federal Government to intrude upon the States and indict officials and agents of state corporations and private firms and associations for the crime of larceny, of embezzlement, and other like offenses known to the statutes of every State. Think what will result!

51 Cong.Rec. 14038 (1914). The bill's proponents, on the other hand, were primarily concerned with remedying widespread scandal and abuse in the railroad industry. In their desire to eliminate fraud, especially watered stock schemes and the sale of railroad property to insiders for inadequate consideration, they had few objections to the imposition of federal penalties for criminal acts affecting interstate commerce even though those acts might already be illegal under state law.

In enacting section 9, Congress clearly rejected Stone's rather sweeping argument against concurrent state and federal criminal jurisdiction. The more narrow constitutional problem perceived by proponents and opponents of the bill alike concerned the effect of section 9 on commerce which was part interstate and part local in nature. Senator Chilton of West Virginia, for example, stated the problem and resolved it in favor of federal intervention regardless of any incidental effect on intrastate commerce.

Simply because in a specific case the director [of a carrier] may not be an interstate instrument, or simply because one piece of freight in a car might not be interstate commerce, does not make the law invalid. We have the general power over interstate commerce, and because intrastate commerce gets in the way, or can not be always found out of the way, we need not surrender our powers.

51 Cong.Rec. 14038 (1914).

Other senators were more troubled than Chilton by the prospect of federal regulation of purely intrastate commerce. In an apparent attempt to put these doubts to rest, Senator Culberson of Texas proposed the 'arising' requirement as an amendment to section 9. In introducing his amendment, Culberson quoted from the then recent decision of the Supreme Court in the Shreveport Rate Case, *Houston, East and West Texas Railway v. United States*, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914), in which the Court permitted federal regulation of rates charged by intrastate carriers competing with interstate carriers. The gist of Culberson's remarks was that federal intervention in intrastate affairs was permitted by the commerce clause if the apparent encroachment was necessary for the adequate protection of interstate commerce. Culberson intended the 'arising' requirement to mean that although federal prosecution under section 9 could take place only if the fraud involved some funds derived from interstate commerce,

if intrastate receipts were affected as well as interstate receipts, the statute would apply, nevertheless, but a conviction could be had, not with reference to intrastate trade or property, but with reference to that affected by or received from or arising out of or accruing from the conduct of interstate commerce as defined in this bill.

51 Cong.Rec. 14041 (1914).

Culberson's intention in proposing the amendment was not understood by some of the other senators. Senator Cummins of Texas, for example, questioned Culberson about whether the 'arising' requirement confined section 9 to actual cash receipts derived directly from railroad operations. Cummins believed that "if you are going to make the misapplication of some of the proceeds [of commerce] an offense we certainly ought to reach an improper diversion of the capital of a railway company or a common carrier as well as the earnings of a carrier." 51 Cong.Rec. 14041 (1914). Although the subsequent exchange between Cummins and Culberson is somewhat confused and ended abruptly with the introduction of unrelated business before the Senate, it is clear that Culberson anticipa-

ted that section 9 as amended would reach the embezzlement of capital as well as proceeds of an interstate carrier. After all, the abuses which prompted the bill in the first place, particularly the scandal surrounding the failure of the New York, New Haven and Hartford Railroad, greatly exceeded the mere theft of cash receipts.

The debate does not support Marino's position that the funds must be traced to a specific transaction in interstate commerce. Although some of section 9's most earnest proponents feared that a strict interpretation of the 'arising' requirement (very like that urged by Marino in this case) might come to restrict the usefulness of the statute, see remarks of Senator Nelson of Iowa, 51 Cong.Rec. 15942 (1914), the Senate debate read as a whole strongly indicates that the amendment was intended only to require that the embezzlement of funds have an effect on commerce sufficient to justify federal intervention under the Shreveport Rate Case. "Arise or accrue," then, should not be interpreted in a narrow accounting sense which would require tracing the funds to a particular transaction. Instead, Congress intended the 'arising requirement' to mean that the funds must be derived from or used in commerce in such a way that theft of the funds has an adverse effect on foreign or interstate commerce. The correct focus is on the connection between the funds of the common carrier and foreign or interstate commerce and not between the funds and some particular transaction in commerce.

The indictment under which Marino and O'Donnel were ultimately tried adopts much but not all of the language of the 'arising' requirement. In all four counts Marino was charged with embezzling funds "arising and accruing from, and used in, in whole or in part, Prudential Lines, Inc.'s business as a firm engaged in commerce as a common carrier." In drawing up the indictment, the government relied on the single word "as" to satisfy the two separate statutory requirements that the carrier be engaged in commerce and that the embezzled funds bear the requisite relation to

commerce. Although more precise draftsmanship charging that the funds and assets themselves bear some relation to interstate commerce beyond mere ownership by the common carrier would have been preferable, the indictment may be fairly read to charge that the funds were in fact derived from foreign or interstate commerce. The indictment describes Prudential as a firm "engaged in commerce as a common carrier in the steamship business." "Commerce," we believe, means for purposes of the indictment exactly what it means for purposes of section 660—interstate or foreign commerce. In this case, any money accruing from or used in Prudential's steamship business must be largely composed of funds which arise from or are used in foreign commerce and which therefore satisfy the jurisdictional requirements of section 660.

The proof at trial bears out this interpretation of the indictment. The government showed Prudential to be engaged exclusively in foreign commerce. The account from which Nelson made the overpayment was Prudential's principal checking account into which the firm deposited most of its revenues from foreign commerce. The presence in the account of some money derived from sources other than commerce would not taint the account for jurisdictional purposes since section 660 applies to funds derived either wholly or in part from interstate or foreign commerce.

The jury instructions followed the language of the indictment closely. The trial court read the pertinent provisions of section 660 to the jury and then discussed in some detail each element of the crime. The court instructed the jury that in order to satisfy the 'arising' requirement

it is not necessary for the Government to prove that the very dollars, monies, or funds which were, according to the Government's contention, misapplied or converted to Nelson's use or the use of others, were at some point actually used by Prudential Lines in commerce. The Government need only show that the conversion or misapplication involved funds or accounts which included monies, such

as operating income, arising or accruing from, or used in, in whole or in part, Prudential's business as a common carrier engaged in commerce.

This instruction, like the indictment, could have been more precise because the statute requires that the embezzled funds themselves be connected with foreign or interstate commerce, not that the funds be connected to a business which is engaged in commerce. In the present case, however, the distinction is of little practical consequence because it is clear from the testimony at trial that virtually all of Prudential's funds and assets are derived from and used in commerce. Accordingly, Marino has failed to demonstrate the presence of reversible error concerning the 'arising' requirement in either the indictment, the proof at trial, or the jury charge.

C. 'Manager' Requirement

■ In order to convict Marino under section 660, the government was required to prove that a president, director, officer, or manager of Prudential participated in the fraud.[3] As a corporate officer of Prudential and Executive-Vice President in charge of operations, John Marano clearly qualified as an officer or manager for purposes of section 660. Marino, however, contends that the evidence at trial does not support a finding that Keith Nelson was also a manager. In addition, he claims that the jury charge concerning the definition of a manager was inadequate. Marino argues, therefore, that the faulty charge may have led the jury to convict Marino on the theory that Nelson (but not Marano) participated in the fraud. In the absence of sufficient evidence that Nelson was a manager, Marino's conviction would not be expressly predicated on a finding of wrongful acts by a carrier executive.

■ Marino's argument fails because both the proof at trial and the jury instructions regarding the manager requirement were entirely adequate. At trial Nelson was shown to have been an executive of some importance within Prudential at the time of the fraud. He supervised a staff of about twenty-five people and was responsible for the use and maintenance of all of Prudential's containers and related trucking and stevedoring equipment. Along with several other division heads, he reported directly to Marano who reported in turn to the president of the company.

Above all, Nelson's role in carrying out the fraud shows him to have been an individual exercising "a great deal of control over financial matters and policy decisions" and therefore posing a special threat to commerce justifying federal prosecution under section 660. *United States v. Gregg*, 612 F.2d 43, 49 (2d Cir. 1979). The initial decision to seek repair and modification of the obsolete containers came from Nelson and was subsequently approved by Marano. Although Marano was the Prudential executive involved in planning the kickback scheme at the outset, Nelson was largely responsible for putting the scheme into operation. In particular, Nelson was in a position at Prudential which enabled him to approve the unusual rush payment of inflated invoices from Marine Repair. In short, the government clearly met its burden of proof that Nelson exercised the authority of a manager during his tenure at Prudential and could satisfy the 'manager' requirement of section 660 even if the jury had determined that Marano was not involved in the fraud.

■ The jury instruction regarding the definition of the term "manager" was also adequate. The trial court instructed the jurors to apply the term in light of their everyday experience and to consider the titles, responsibilities, authority, and hierarchical positions of both Nelson and Marano. In the case of a term like 'manager' which has no specific technical meaning and is within the common understanding of the jurors, a special definition by the trial court is unnecessary. *See United States v. Johnson*, 575 F.2d 1347, 1357 (5th Cir. 1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1213, 59

---

3. The employee provision of section 660 has no application in this case because it is limited to theft or embezzlement by employees actually riding in interstate commerce.

L.Ed.2d 454 (1979). The trial court's instruction concerning the manager requirement, therefore, contains no reversible error.

### II. Pre-Trial Disclosure and Admission into Evidence of the B Series of Invoices.

Much of the documentary evidence introduced at trial by the government consists of copies of invoices submitted by Marine to Prudential for work performed on chassis and containers. The majority of these invoices, the so-called A series, were submitted directly to Nelson for special approval and rush payment. In addition, Marino submitted a second group of invoices, the B series, through ordinary billing channels at Prudential. Prudential then seems to have paid both the A and the B series of invoices. On appeal Marino objects to the introduction of the B series on grounds of unfair surprise, prejudice, and irrelevance.

### A. Unfair Surprise

Marino claims that the government's failure to disclose in a timely fashion its intention of introducing the B series hindered his defense because his attorney had no adequate opportunity to prepare a means of countering the effect of the B series. The record, however, simply does not support Marino's argument.

 Several weeks before trial the government gave Marino's attorney access to a collection of documents (between one and six file drawers according to various representations by counsel at trial) which included the B series as well as other documents used by the government in preparation for trial. The government notified Marino's attorney that some of the documents in the collection might be offered into evidence. Marino concedes that by making the B series available in this manner, the government complied with the technical requirements of Fed.R.Crim.P. 16(a)(1)(C) which governs pretrial discovery of documents and tangible objects. He contends, however, that the government surprised him unfairly because he and his at-

torney were not told that the B series would be offered into evidence until shortly before the close of the government's case-in-chief.

The record indicates that both the letter and the spirit of Fed.R.Crim.P. 16 were fully satisfied in this case. The collection of documents made available to Marino before trial, while extensive, does not seem to have exceeded the capacity of an attorney to read and study in preparation for a major trial. The B series, moreover, apparently came to the government from Marine Repair's files and concerns business transactions in which Marino was directly involved. Finally, Marino and his attorney received a special continuance in the midst of trial to give them an opportunity for preparation concerning the B series. In short, the defense received fair notice of the existence of documents, including the B series, which the government might use at trial, an opportunity to review these documents before the start of trial, and a special opportunity *in medias res* to review copies of the B series before putting on its own case. Marino has shown no unfair surprise which justifies reversal on appeal.

### B. Relevance and Prejudice

Marino also contends that the admission of the B series was prejudicial and the documents irrelevant because the B series indicates only that Marine Repair may have engaged in a second, quite separate fraud involving billing Prudential twice for the same services. The record indicates, however, that the B series was used at trial by the government for a relevant purpose which outweighs the possible prejudicial effect on the jury.

The A series invoices submitted to Nelson for rush payment are not rich in descriptive detail. In most cases, they contain an amount for labor and a single charge for parts of about $650 which is attributed to a front and rear twist lock assembly. The government introduced testimony at trial that the four necessary twist locks should have cost no more than thirty-five dollars each. In the course of its closing argument,

the government argued to the jury that the $650 charges for parts in the A series invoices were grossly inflated and a mere cover for money intended for Nelson, Marano, and Scotto.

 The B series bears out this claim of inflation. The invoices in this series contain lengthy itemized lists of relatively inexpensive parts typically costing about $400 per chassis. Charges for twist locks do not appear on the B series invoices. An isolated and extremely high charge for twist locks in an A series invoice and a long list of charges in the matching B series invoice for a variety of parts needed to repair the same chassis fairly tends to show that the isolated charge for twist locks concealed the fraudulent transfer of money from Prudential to Marine Repair.

Although the government suggested in its closing that Marine Repair may have engaged in double-billing, that argument was not improper. In the absence of the B series, one of the puzzles in this case would have been how Marine Repair could afford to kickback nearly half the amount paid through the A series of invoices for the repair of each chassis. An answer suggested by the B series is that Marine Repair could afford such largesse because it was collecting twice for each chassis it repaired. Marino and O'Donnel were not on trial for concocting such a scheme, but it was not error to permit the jury to consider the part such double-billing might have played in making possible the operation of the kickback scheme for which Marino and O'Donnel were indicted.

In short, the B series was highly probative and relevant. Any prejudice stemming from the jury's discovery that Marino and his company may have been engaged in a certain amount of disgraceful behavior not charged in the indictment was more than offset by the light the B series cast on the means Marino, Nelson, and Marano employed to work the kickback scheme. Ad-

mission of the B series, therefore, was entirely proper.

The judgment of conviction is affirmed.