**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donaciano HERNANDEZ–ESCARSEGA,
Defendant–Appellant.**

**No. 86–5320.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1988.

Submission Withdrawn June 17, 1988.

Resubmitted Sept. 12, 1989.

Decided Oct. 4, 1989.

Barry Tarlow and Mark O. Heaney, Los Angeles, Cal., for defendant-appellant.

Roger W. Haines, Jr., Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before HUG, KOZINSKI and NOONAN, Circuit Judges.

HUG, Circuit Judge:

On August 20, 1986, following an 18–day trial, a jury found Donaciano Hernandez–Escarsega ("Hernandez") guilty of a series of drug-related offenses. Specifically, the jury convicted Hernandez of conspiracy to import marijuana, in violation of 21 U.S.C. §§ 952, 960, and 963 (1982 & Supp. V 1987); conspiracy to possess marijuana with intent to distribute, in violation of 21 U.S.C. §§ 841 and 846 (1982 & Supp. V 1987); conspiracy to travel in interstate and foreign commerce in aid of a racketeering enterprise, in violation of 18 U.S.C. §§ 371 and 1952(a)(3) (1982); and engaging in a continuing criminal enterprise, in violation of 21 U.S.C. § 848 (Supp. V 1987). Hernandez was sentenced to 40 years in prison and the forfeiture of various properties on the continuing criminal enterprise conviction. He received concurrent sentences of 5, 15 and 5 years on the three conspiracy convictions.

In this appeal, Hernandez raises a battery of claims challenging his convictions, sentencing, and the order of forfeiture. His myriad contentions, and the facts pertinent thereto, are addressed under separate headings. We affirm the conviction for engaging in a continuing criminal enterprise and the property forfeiture. We also affirm the conviction for conspiracy to travel in aid of a racketeering enterprise. We remand for vacation of the convictions for the conspiracy to import marijuana and the conspiracy to possess with intent to distribute as being punishment that is impermissibly cumulative, under the Double Jeopardy clause, to the sentence imposed for the continuing criminal enterprise conviction.

I.

ADEQUACY OF SEARCH WARRANTS

On July 27, 1985, a grand jury returned an indictment charging Hernandez and 20 co-conspirators with numerous drug-related crimes. Shortly thereafter, on August 8, Government agents executed search warrants at two residences and one office connected to Hernandez. The warrants were based on allegations contained in a single affidavit presented to the magistrate by Agent Larry Johnson, an investigator with the San Diego Integrated Narcotic Task Force. Hernandez contends that the Johnson affidavit failed to establish probable cause to search his office and residences. He further argues that the warrants were overbroad, both facially and as executed. We review a magistrate's determination of probable cause only for clear error. *See United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir.1986). A finding "that under the totality of the circumstances the magistrate had a substantial basis for concluding that probable cause existed" is sufficient to uphold the warrant. *Id.* (citation omitted). In contrast, this court reviews *de novo* the district court's finding that a warrant describes with sufficient particularity the

items to be seized. *See United States v. Rabe,* 848 F.2d 994, 997 (9th Cir.1988).

### A. *Probable Cause*

When deciding whether to issue a warrant, a magistrate must "make a practical common-sense decision whether, given all the circumstances set forth in the affidavit before him, ... there is a fair probability that contraband or evidence of crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983). To aid the magistrate in making this determination in the present case, Agent Johnson submitted a 52–page affidavit describing in detail his investigation of Hernandez. The affidavit begins with a discussion of Johnson's extensive training and experience in drug trafficking matters. It notes that Hernandez and others recently were indicted on a series of drug charges stemming from the activities described in the affidavit. It then summarizes Agent Johnson's conclusions, stating that Hernandez appears to be the head of a large-scale drug smuggling organization operating in Southern California and Arizona, that this operation involves the transportation of drugs by airplane from Mexico for distribution in the United States, and that over 200 individuals purportedly work under Hernandez' control.

In support of these conclusions, the Johnson affidavit first recounts information supplied by Hernandez' former paramour, Rosemary Rosales, to the Yuma County Sheriff's Office. In her statement, given to the police in 1977, Rosales described her participation in and Hernandez' orchestration of extensive smuggling activity spanning several years. The information is detailed and indicates that Hernandez was involved in a major drug-trafficking operation. Indeed, Rosales estimated that she handled millions of dollars for Hernandez in connection with his narcotics activities. Rosales also told the police in this interview that it was initially her idea to use the proceeds from Hernandez' drug smuggling to invest in legitimate businesses and real estate. Rosales' story was corroborated both by her arrest in 1974 for transporting approximately 400 pounds of marijuana and by the statements of a confidential informant (Confidential Source 4) attesting to the fact that Hernandez and Rosales were engaged in drug smuggling during the seventies and early eighties.[1]

The Johnson affidavit next describes the purchase of an airplane in 1983 by Francis Mulleaux and Frank Peacock, alleged associates of Hernandez. The airplane was purchased with $80,000 in cash and the seller was requested by the buyers to leave the bill of sale blank. In further discussions, the buyers indicated that the "money man" behind the purchase was a Mexican national living in Los Angeles. Two of Johnson's confidential informants reported being told by Peacock that Hernandez supplied the money for this transaction.

James Richards was arrested in December 1983. A search of his car revealed evidence linking Richards to Peacock and Mulleaux and implicating him in marijuana trafficking. In a subsequent statement to the police, Richards admitted that he participated in an air smuggling organization headed by an individual known to him as "Don." Richards had personal knowledge of the importation of four loads of marijuana. He identified the organization's main pilot as "Frank." Finally, Richards identified Frank as the pilot of a plane that crashed in October 1983. Police reports confirmed that the plane was found in the area described by Richards. There was marijuana debris in the aircraft.

---

1. In his brief, Hernandez contends that the Johnson affidavit is flawed because it contains material misrepresentations and does not include relevant information regarding the credibility of several information sources, including Rosales. However, when the district court specifically inquired whether Hernandez sought a hearing pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), counsel expressly stated that the defense did not want such a hearing. *See United States v. Hernandez–Escarsega,* No. 85–536–JLI–Crim. (S.D. Cal. July 18, 1986). Nor has Hernandez contested the district court's failure to hold a *Franks* hearing on appeal. Under these circumstances, we will not consider Hernandez' allegations in ruling on the sufficiency of the affidavit. *See United States v. Spillone,* 879 F.2d 514, 523 (9th Cir.1989).

Confidential Source 1 ("CS1") also related information concerning Peacock, Mulleaux, and Hernandez to Agent Johnson for inclusion in the warrant affidavit. In addition to supplying general comments about the relationship of these individuals, CS1 gave a specific description of Peacock's arrest in Mexico during 1983 and Hernandez' subsequent efforts to obtain the release of Peacock and his plane. Peacock later told CS1 that Hernandez had paid one million dollars to the Mexican police to effect his release and the release of his marijuana-stocked aircraft. Finally, CS1 provided information regarding Hernandez' reaction to Richards' arrest and Hernandez' involvement in cocaine smuggling during December 1983.

Confidential Source 2 ("CS2") corroborated much of the information provided by CS1. In addition, CS2 recounted several conversations with Peacock during which Peacock discussed the scope of Hernandez' drug-trafficking organization. For instance, Peacock told CS2 that Hernandez was the largest smuggler of marijuana in southern California, that he had hundreds of individuals working for him in his nationwide narcotic distribution organization, that he was extremely wealthy from drug trafficking, and that he had accumulated substantial real estate over the years with proceeds derived from the sale of narcotics. Finally, CS2 described in some detail two instances in late 1983 when Peacock flew loads of marijuana into the United States.

Confidential Source 3 ("CS3"), debriefed in mid-1984, indicated that he was aware that during December 1983 and January 1984, Hernandez received and distributed 20 tons of marijuana. According to CS3, Hernandez and another individual almost totally controlled the marijuana market in the Los Angeles area. CS3 was also aware that Hernandez had opened a bar in Arizona called the "Cat Palace" which was used to launder money.

■ Agent Johnson's affidavit also included a description of an incident that occurred on September 17, 1984, at the San Ysidro Port of Entry. On that date, Hernandez and another individual, Antonio Quintero–DeAvila, entered the United States from Mexico through the San Ysidro checkpoint. The two men were asked if they had anything to declare and, based upon Hernandez' statement that he had more than $5,000, were referred to secondary inspection. Hernandez filled out a form declaring $7,800. A subsequent search of the vehicle, however, revealed additional money secreted in the rear spare tire area. After being read his *Miranda* rights, Hernandez stated that, other than admitting that the money belonged to him, he did not wish to talk. The currency seized by customs agents during this incident was later subjected to a canine sniff. The dog's alert indicated that the money had been in proximity to narcotics.[2]

2. Hernandez argues that the currency seizure and subsequent dog alert should not be factored into the probable cause calculus because they constitute fruits of statements made by Hernandez during the course of an illegal interrogation by customs agents. The district court concluded that Hernandez' statements, the seized money, and the canine alert were all properly considered by the magistrate. We agree. The initial stop and questioning of Hernandez, which led to the money seizure and canine sniff, was justified by his presence at the border. *See United States v. Alfonso,* 759 F.2d 728, 733 (9th Cir.1985) ("mere entry into the United States from a foreign country provides sufficient justification for a border search"). When unreported currency was discovered in his vehicle, Hernandez was read his *Miranda* rights. Even if Hernandez is correct in his assertion that his *Miranda* rights were somehow violated during this interchange with customs, his statements,

which he does not argue were involuntary, were still properly included in the warrant affidavit and relied upon to establish probable cause. *See United States v. Patterson,* 812 F.2d 1188, 1193 (9th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1093, 99 L.Ed.2d 255 (1988). Any fruits of those statements were also properly considered. *See id.*

In reviewing the magistrate's probable cause finding, however, the district judge refused to consider other evidence derived from the San Ysidro border incident because he believed it was illegally obtained. Evidence gleaned from a 1983 vehicle stop and arrest of Hernandez was also disregarded by the district court for similar reasons. We do not here review the propriety of the district court's rulings on these matters because we conclude that the Johnson affidavit is legally sufficient even without this evidence. *See United States v. Alexander,* 761 F.2d 1294, 1300 (9th Cir.1985) (search warrant is valid if

Agent Johnson's affidavit concludes with a description of Hernandez' relationship to the three locations to be searched. Based upon this information, the magistrate determined that probable cause existed sufficient to justify the issuance of the warrants sought by the authorities. The district court concurred in this conclusion.

■ Given the wealth of incriminating information detailed in the Johnson affidavit, we have little difficulty concluding that the magistrate had a "substantial basis" for his probable cause finding. Numerous individuals testified to the fact that Hernandez' involvement with drugs had been far from casual for over ten years. Although the reliability of several of Johnson's confidential sources was not clearly established, the detailed nature of many of their statements and the interlocking nature of their stories enhanced their credibility. *United States v. Landis*, 726 F.2d 540, 543 (9th Cir.1984) ("interlocking tips from different confidential informants enhance the credibility of each" (citations omitted)), *cert. denied*, 467 U.S. 1230, 104 S.Ct. 2688, 81 L.Ed.2d 882 (1984); *see also Gates*, 462 U.S. at 234, 103 S.Ct. at 2330 ("explicit and detailed description of alleged wrongdoing" entitles tip to "greater weight"). Moreover, included in Agent Johnson's affidavit was the fact that, on July 27, 1985, less than ten days earlier, Hernandez and 20 others were indicted for drug-related crimes. Although the fact that the grand jury found probable cause to believe that Hernandez was involved in the importation of narcotics is not determinative, *see United States v. Ellsworth*, 647 F.2d 957, 964 (9th Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2008, 72 L.Ed.2d 465 (1982), it could certainly be considered by the magistrate, *see United States v. Rubio*, 727 F.2d 786, 794–95 (9th Cir.1983). Thus, the magistrate's probable cause determination seems unassailable.

■ Hernandez, however, argues that the information contained in the Johnson affidavit was too stale to establish probable cause in August 1985, the month when the search warrants were executed. He claims

that the most recent reliable information described in the affidavit related to events occurring in December 1983, over 20 months before the warrants issued. Hernandez' argument ignores the statements made by CS3 in mid–1984 regarding Hernandez' stature in the Los Angeles drug community. It similarly disregards the incriminating evidence obtained in the September 1984 border stop. Finally, Hernandez fails to consider the fact that the Johnson affidavit detailed numerous instances of his involvement with drugs throughout the prior decade. The affidavit thus tended to establish the existence of a widespread, firmly entrenched, and ongoing narcotics operation in which Hernandez played a pivotal role. In such circumstances, staleness arguments lose much of their force. *See United States v. Dozier*, 844 F.2d 701, 707 (9th Cir.) ("mere lapse of substantial amounts of time is not controlling" where "the ongoing nature of a crime ... might lead to the maintenance of tools of the trade"), *cert. denied*, — U.S. —, 109 S.Ct. 312, 102 L.Ed.2d 331 (1988); *Landis*, 726 F.2d at 542 ("[t]he continuous nature of the activity diminishes the significance of the time lag between the acts described in the affidavit and presentation of the affidavit to the magistrate").

The affidavit in this case contained Agent Johnson's expert opinion that individuals who traffic in large quantities of illicit drugs generally keep records, proceeds from drug transactions, and other evidence in their homes, offices, and stash houses. *See United States v. Seybold*, 726 F.2d 502, 504 (9th Cir.1984) ("[w]e have repeatedly found the opinions of experienced law enforcement agents highly important in making probable cause determinations" (citations omitted)). Further, the records and other documentary evidence that were sought when the warrants were executed "are the type of records typically found to be maintained over large periods of time." *Dozier*, 844 F.2d at 707 (citing *Andresen v. Maryland*, 427 U.S. 463, 478 n. 9, 96 S.Ct. 2737, 2747 n. 9, 49 L.Ed.2d 627 (1976)) (other citation omitted). The

combination of all untainted information in

supporting affidavit establishes probable cause).

information relied upon by the magistrate in issuing the warrants was thus not so stale that probable cause was lacking.

Nor do we believe, as Hernandez contends, that the magistrate erred in issuing the warrants because the Johnson affidavit failed to establish probable cause that the items to be seized actually existed and could be found at the premises searched. The affidavit suggested that Hernandez used legitimate businesses to launder his drug-trafficking proceeds, that he used those proceeds to purchase real estate, that he purchased airplanes and other materials to advance the ends of his extensive smuggling and distribution operation, and that he had been engaging in these activities for over ten years. In such circumstances, it was highly likely organizational records existed. Moreover, the affidavit contains Agent Johnson's expert opinion that "individuals who traffic large quantities of illicit drugs will customarily maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances." Finally, given these facts, the magistrate had a substantial basis for crediting Johnson's conclusion that these records were likely to be kept at his residence, the home of his wife and daughter that he had recently been observed visiting, and the Magnolia Street office. *See United States v. Fannin,* 817 F.2d 1379, 1382 (9th Cir.1987) ("The magistrate 'need not determine that the evidence sought is *in fact* on the premises to be searched . . . or that the evidence is more likely than not to be found where the search takes place. . . . The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.' " (citation omitted)); *see also United States v. Angulo–Lopez,* 791 F.2d 1394, 1399 (9th Cir.1986) ("In the case of drug dealers, evidence is likely to be found where the dealers live. When the traffickers consist of a ringleader and assistants, a fair probability exists that drugs will be present at the assistants' residence as well as the ringleader's." (citations omitted)).

**B.** *Overbreadth*

■ Hernandez next argues that, even if probable cause existed to justify their issuance, the search warrants in this case must be invalidated as impermissibly overbroad. Specifically, Hernandez objects to the language in the warrants authorizing the seizure of the following:

> Records, including, but not limited to, notes, records and ledgers showing drug transactions, records and drug customer lists, bank records, financial records, currency, bills, log books, photographs, and any other records or documents reflecting the possession and/or distribution of controlled substances; . . . records reflecting the acquisition of property obtained with proceeds derived from narcotics trafficking; [and] records reflecting interstate and foreign travel in connection with narcotics trafficking.

According to Hernandez, these descriptions were too vague to supply any meaningful guidance to the agents who executed the warrants as to which individual documents were rightfully subject to seizure.

Under the Fourth Amendment, a search warrant must "particularly describ[e] the place to be searched, and the person or things to be seized." U.S. Const. amend. IV. The Constitution thus "prohibits the issuance of general warrants that would lead to 'exploratory rummaging in a person's belongings.' " *Rabe,* 848 F.2d 994 at 997 (citations omitted). However, "[a] warrant need only be reasonably specific in its description of the objects of the search and need not be elaborately detailed." *United States v. Hayes,* 794 F.2d 1348, 1354 (9th Cir.1986) (citation omitted), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94 L.Ed.2d 146 (1987). In the final analysis, "[t]he specificity required in a warrant varies depending on the circumstances of the case and the type of items involved." *Center Art Galleries–Hawaii, Inc. v. United States,* 875 F.2d 747, 749 (9th Cir.1989) (quoting *United States v. Spilotro,* 800 F.2d 959, 963 (9th Cir.1986)) (other citation omitted). We conclude that, given the particular circumstances of this case, the war-

rants are sufficiently descriptive to survive constitutional attack.

In *United States v. Fannin,* 817 F.2d 1379 (9th Cir.1987), we upheld similar language despite an overbreadth challenge. In that case, the warrant at issue authorized seizure of a series of items "including correspondence, bank records, photographs, telephone answering devices, currency, ledgers, and other items providing evidence of illegal trafficking in controlled substances." *Id.* at 1381. We concluded that the warrant was not constitutionally infirm because it limited the scope of the search to items related to the particular criminal activity described in the warrant and attached affidavit. *Id.* at 1383. It therefore effectively told the executing officers "to seize only those items related to illegal drug trafficking." *Id.; see also United States v. Washington,* 797 F.2d 1461, 1472 (9th Cir.1986) (warrant authorizing seizure of "records, notes, [and] documents indicating [the defendant's] involvement and control of prostitution activity including *but not limited to,* photographs, handwritten notes, ledger books, transportation vouchers and tickets, hotel registration, receipts, bank documents as deposit slips, checks and records," etc., held not overly broad because it "effectively tells the officers to seize only items indicating prostitution activity" (emphasis in original)); *Hayes,* 794 F.2d at 1355–56 (warrant permitting seizure of "all records which document the purchasing, dispensing and prescribing of controlled substances, including, but not limited to, records contained in patient charts ... patient logs, appointment books and other records and ledgers reflecting distribution of controlled substances," etc. not invalid because officers limited to seizing items related to controlled substances). The warrants in this case similarly limited the discretion of the executing agents by condoning seizure only of those records reflecting possession or distribution of controlled substances, acquisition of property with drug proceeds, and interstate travel in connection with drug trafficking.

Hernandez' argument that the warrants, in effect, permitted seizure of virtually all of his records does not change our analysis. Agent Johnson's affidavit portrayed Hernandez as the kingpin of an extensive narcotics distribution network who used legitimate businesses as fronts for his illegal drug trafficking activities. Thus, there was probable cause to believe that all of Hernandez' personal and business activities were pervaded by his involvement with narcotics. In such situations, the breadth of the seizure is justified by the breadth of the probable cause. *See United States v. Offices Known as 50 State Distrib. Co.,* 708 F.2d 1371, 1374 (9th Cir.1983), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984); *see also United States v. McClintock,* 748 F.2d 1278, 1282–83 (9th Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985). In *50 State,* for instance, the affidavit supporting the warrant evidenced a pervasively fraudulent operation that encompassed the entire business located at the premises searched. *Id.* We upheld the warrant, which effectively authorized seizure of all business records, stating:

> While the seizure was extraordinarily broad, and in that sense "general", under the particular facts of this case the scope of the warrant was justified. It was not possible through more particular description to segregate those business records that would be evidence of fraud from those that would not, for the reason that there was probable cause to believe that fraud permeated the entire business operation of *50 State.*

*Id.* The situation in Hernandez' case is similar and justifies the breadth of the warrants issued.[3]

---

3. Relying on *United States v. Tamura,* 694 F.2d 591 (9th Cir.1982), Hernandez claims that, regardless of the validity of the warrants, the executing agents' wholesale seizure of his business records amounted to an impermissible general search. Given our endorsement of the broad language contained in the warrants in this case, it is likely that the majority of the seized documents fell within the scope of the warrants' authorization. Further, even if some documents not covered by the warrants were improperly seized, this fact does not invalidate the entire search unless there was a flagrant disregard for the terms of the warrant. *See*

The search warrants in the present case were adequately supported by probable cause and were not overbroad. Hernandez' suppression motion was thus properly denied.

## II.

### MOTION TO DEPOSE FOREIGN WITNESS

Before trial, Hernandez moved the district court pursuant to Fed.R.Crim.P. 15(a) for permission to take the deposition of Fernando Corona Romo, a Mexican citizen residing in Guadalajara. Hernandez claimed that Romo's testimony was material to his defense and could not otherwise be obtained because Romo, fearing arrest on an outstanding federal indictment, refused to come to the United States to testify. After hearing argument on the motion, the district judge refused to authorize the taking of Romo's deposition. Subsequent attempts by the defense to renew the motion during trial met with similar defeat. Hernandez contends on appeal that the district court's disallowance of the foreign deposition was error. We review the denial of a motion to depose a witness under Rule 15(a) for abuse of discretion. *See Territory of Guam v. Ngirangas*, 806 F.2d 895, 896 (9th Cir.1986); *United States v. Richardson*, 588 F.2d 1235, 1241 (9th Cir.1978), *cert. denied*, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979).

■ Rule 15(a) provides in relevant part: Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition.... Several of our cases have suggested that "the interest of justice" is not served by using Rule 15(a) to authorize the taking of

a fugitive's deposition. *See United States v. Murray*, 492 F.2d 178, 195 (9th Cir.1973), *cert. denied*, 419 U.S. 854, 95 S.Ct. 98, 42 L.Ed.2d 87 (1974) ("to allow the testimony of fugitives to be taken by deposition would amount to an injustice" (citations omitted)); *see also Richardson*, 588 F.2d at 1241. More recently, however, we made clear that a potential deponent's fugitive status does not act as a complete bar to Rule 15(a) relief. *See Ngirangas*, 806 F.2d at 897. In *Ngirangas*, a case decided after Hernandez was convicted, we interpreted our earlier case as holding that fugitive status is a relevant but not dispositive factor in the Rule 15(a) calculus. *Id.* While we recognized that it is, in a sense, " 'unjust' to allow a fugitive, who flouts the legal system, to participate in that system with special dispensation, i.e., without the check of perjury sanctions," we concluded that it is at times "more unjust to deprive a defendant of what may be crucial exculpatory testimony." *Id.* Thus, the facts of each case must be separately considered to determine whether the exceptional circumstances contemplated by Rule 15(a) exist, justifying the deposition of even those individuals who consciously hold themselves beyond the reach of the law.

■ Hernandez argues that the district court erred in the instant case because, contrary to our holding in *Ngirangas*, it relied *solely* on Romo's fugitive status to support its denial of his Rule 15(a) motion. Hernandez' contention, however, is not borne out by the record. It is true that the district judge was obviously disturbed by Romo's fugitive status. In denying Hernandez' motion, the judge on several occasions focused on Romo's unwillingness to testify for fear of personal prosecution. But the trial court also concluded that Hernandez had made an insufficient showing of need to justify the procedure. After reviewing the offer of proof submitted by the defense, which detailed Romo's expect-

*United States v. Crozier*, 777 F.2d 1376, 1381 (9th Cir.1985). We see no flagrant disregard here. That being the case, "[o]nly those items which fall outside the scope of the warrant need be suppressed." *Id.* (citation omitted); *see also Andresen*, 427 U.S. at 482 n. 11, 96 S.Ct. at 2749 n.

11 (normal remedy for improper seizure is suppression and return). Hernandez does not claim that any improperly seized evidence was introduced against him at trial. Thus, his allegation that some records were improperly seized does not affect this appeal.

ed testimony, the court found that the evidence was in some respects irrelevant and in others cumulative and possibly inadmissible as hearsay. Thus, it is clear that the district court considered more than Romo's fugitive state when ruling that the taking of his deposition was unwarranted.

When Rule 15(a) was adopted, "[i]t was contemplated that in criminal cases depositions would be used only in exceptional situations." Fed.R.Crim.P. 15 note. Applying the appropriate legal standard, the district court determined that exceptional circumstances were not present in this case. We have reviewed the record and cannot conclude this decision constitutes an abuse of discretion.

## III.

## JURY INSTRUCTION CHALLENGES

Hernandez contends that the district court's instructions to the jury were flawed in numerous ways. We consider jury instructions as a whole to determine if they are misleading or inadequate. *United States v. Beltran–Rios*, 878 F.2d 1208, 1214 (9th Cir.1989). Whether a jury instruction misstates the applicable law is a legal question we review *de novo*. *See Collins v. City of San Diego*, 841 F.2d 337, 340 (9th Cir.1988); *Poling v. Morgan*, 829 F.2d 882, 885 (9th Cir.1987) (whether instructions "set out the law incorrectly" reviewed *de novo*). Similarly, a district court's failure to instruct on a defendant's theory of the case is subject to *de novo* review. *United States v. Doubleday*, 804 F.2d 1091, 1093 (9th Cir.1986) (citation omitted), *cert. denied*, 481 U.S. 1005, 107 S.Ct. 1628, 95 L.Ed.2d 201 (1987). It is not error, however, to reject a theory-of-the-case instruction if the other instructions in their entirety cover the defense theory.

**4.** Specifically, section 848 provides in pertinent part:
 [a] person is engaged in a continuing criminal enterprise if—
 (1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
 (2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

*United States v. Kenny*, 645 F.2d 1323, 1337 (9th Cir.), *cert. denied*, 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981). Indeed, "[s]o long as the instructions fairly and adequately cover the issues presented, the judge's formulation of those instructions or choice of language is a matter of discretion." *United States v. Echeverry*, 759 F.2d 1451, 1455 (9th Cir.1985) (citing *United States v. Abushi*, 682 F.2d 1289, 1299 (9th Cir.1982)).

We address each of Hernandez' instructional claims in turn.

### A. *The CCE Instruction*

In order to prove that a defendant is guilty of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848, the government must establish (1) that the defendant's conduct constituted a felony violation of federal narcotics law; (2) that the described conduct occurred as part of a continuing series of violations of federal narcotics law; (3) that the defendant undertook the activity in concert with five or more persons; (4) that the defendant acted as the organizer, supervisor, or manager of the criminal enterprise; and (5) that the defendant obtained substantial income or resources from the purported enterprise. *See United States v. Sterling*, 742 F.2d 521, 525 (9th Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2322, 85 L.Ed.2d 840 (1985).[4] For purposes of the second element, "continuing series" has been interpreted by the courts as consisting of three or more federal narcotics violations. *See id.* at 526 (citing *United States v. Valenzuela*, 596 F.2d 1361, 1367 (9th Cir.), *cert. denied*, 444 U.S. 865, 100 S.Ct. 136, 62 L.Ed.2d 88 (1979)); *see also United States v. Young*, 745 F.2d 733, 747 (2d Cir.1984)

 (A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
 (B) from which such person obtains substantial income or resources.

(collecting cases), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985).

Hernandez first argues that the government should not be able to rely on conspiracies charged in violation of 21 U.S.C. §§ 846 and 963 when attempting to establish a "continuing series" of narcotics violations for purposes of section 848 liability. He claims that the district court erred in refusing an instruction that expressly admonished the jury that title 21 conspiracies cannot serve as predicate offenses under the CCE statute. We find Hernandez' position indefensible.

■■■ As the Third Circuit has recognized, the CCE statute "provides, in clear language that *any* felony violation of Subchapters I and II of Chapter 13 of Title 21 is an eligible predicate. There is no exclusionary or delimiting language as to § 846, § 963, or ... any other felony." *United States v. Fernandez,* 822 F.2d 382, 384 (3d Cir.), *cert. denied,* 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 391 (1987); *see also Young,* 745 F.2d at 750; *cf. United States v. Zavala,* 839 F.2d 523, 527 (9th Cir.1988) (noting that the CCE statute "unambiguously provides that felony violations of the relevant subchapters will suffice" when finding illegal use of a communication facility in violation of 21 U.S.C. § 843(b) a proper predicate offense), *cert. denied,* —— U.S. ——, 109 S.Ct. 86, 102 L.Ed.2d 62 (1988). Moreover, although this circuit has not resolved the issue, overwhelming extra-circuit authority holds that reliance on title 21 conspiracies to establish a section 848 violation is proper. *See, e.g., United States v. Hall,* 843 F.2d 408, 410–11 (10th Cir.1988); *Fernandez,* 822 F.2d at 383–85; *United States v. Ricks,* 802 F.2d 731, 737 (4th Cir.) (en banc), *cert. denied,* 479 U.S. 1009, 107 S.Ct. 650, 93 L.Ed.2d 705 (1986); *United States v. Rosenthal,* 793 F.2d 1214, 1227 (11th Cir.), *modified on other grounds,* 801 F.2d 378 (1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Schuster,* 769 F.2d 337, 345 (6th Cir.1985), *cert. denied,* 475 U.S. 1021, 106 S.Ct. 1210, 89 L.Ed.2d 322 (1986);

*Young,* 745 F.2d at 748–52; *United States v. Middleton,* 673 F.2d 31, 33 (1st Cir.1982) (dictum); *cf. United States v. Chiattello,* 804 F.2d 415, 420 (7th Cir.1986) (noting that the question is an open one in the Seventh Circuit). We join our sister circuits and conclude that title 21 conspiracies may serve as predicate offenses under the CCE statute. The district judge's refusal to instruct the jury to the contrary therefore cannot be deemed error.

■■■ We may dispatch Hernandez' second challenge to the district court's CCE instruction with similar speed. In order to impose liability under section 848, the jury must find that the defendant acted as the "organizer," "supervisor," or "manager" of a criminal enterprise. *See* 21 U.S.C. § 848(c)(2)(A); *Sterling,* 742 F.2d at 525. Hernandez claims that the district court erred by refusing to define the concepts of management and supervision for the jury. In *United States v. Johnson,* 575 F.2d 1347 (5th Cir.1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 454 (1979), however, the Fifth Circuit expressly rejected this argument, holding that "[t]he words and phrases in the [CCE] statute are neither outside the common understanding of a juror, nor so technical or ambiguous as to require a specific definition," *id.* at 1357–58 (citations omitted). Other case law supports the position taken by the *Johnson* court. *See Valenzuela,* 596 F.2d at 1367 (rejecting vagueness challenge to CCE statute and holding that its words "enjoy a wide currency in the business community and are commonly understood by members of the general public"); *see also United States v. Anderson,* 859 F.2d 1171, 1175 (3d Cir.1988) (quoting *Johnson*); *United States v. Marino,* 639 F.2d 882, 888 (2d Cir.), *cert. denied,* 454 U.S. 825, 102 S.Ct. 115, 70 L.Ed.2d 99 (1981) (term "manager" is within the common understanding of the jury and therefore needs no special definition). Although special circumstances may exist in which more specific instructions are required, *see Johnson,* 575 F.2d at 1358, we see no reason to depart from the general rule in this case.[5] The district

---

**5.** We note in this regard that the jury *was* in-

structed that "an individual who purchases sub-

**1572**

court did not err by refusing Hernandez' definitional instructions.

Hernandez' final challenge to the district court's CCE instruction is that the trial court compromised his constitutional right to a unanimous verdict by failing to instruct the jury that it must unanimously agree on what three acts satisfied section 848's continuing series requirement. Although a general unanimity instruction was given by the district court, Hernandez claims that a specific instruction focusing on the predicate acts was necessary to protect his unanimity rights. To support this assertion, Hernandez relies on a recent Third Circuit case, *United States v. Echeverri*, 854 F.2d 638 (3d Cir.1988), which held that a specific unanimity instruction was required on somewhat similar facts.

■ This circuit has repeatedly held that, in the ordinary case, a general instruction on jury unanimity is sufficient to protect a defendant's constitutional rights. *See, e.g., United States v. Anguiano*, 873 F.2d 1314, 1319 (9th Cir.1989); *United States v. Gilley*, 836 F.2d 1206, 1211 (9th Cir.1988); *United States v. Ferris*, 719 F.2d 1405, 1407 (9th Cir.1983). Unanimity, however, "means more than a conclusory agreement that the defendant has violated the statute in question; there is a requirement of substantial agreement as to the [principal] factual elements underlying a specified offense." *Ferris*, 719 F.2d at 1407 (citing *United States v. Gipson*, 553 F.2d 453, 457–58 (5th Cir.1977)). Thus, "[w]hen it appears ... that there is a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts, the general unanimity instruction does not suffice." *United States v. Echeverry*, 719 F.2d 974, 975 (9th Cir.), *modifying* 698 F.2d 375 (1983); *see also Anguiano*, 873 F.2d at 1319–21. In such situations, the trial court must augment its general instruction to ensure that the jury understands its duty unanimously to agree to a particular set of facts. *Echeverry*, 719 F.2d at 975. We need not

decide in the instant case, however, whether such augmentation was necessary to safeguard Hernandez' rights, because we find that the facts support the conclusion that the jury unanimously agreed on three predicate offenses. Thus, any instructional error was harmless.

In this case, the CCE charge in the indictment, which was read to the jury and taken by the jury to the jury room, listed eleven violations constituting the required series. Two of the violations were the conspiracy for importation of marijuana and conspiracy to possess with intent to distribute marijuana. Hernandez was convicted on both of these charges and thus there is no question of juror unanimity on these two listed violations. We are therefore only concerned with whether the jury unanimously agreed on at least a third violation. The remaining listed violations were substantive offenses of importation and possession with intent to distribute marijuana alleged to have been committed by members of the two conspiracies. They involved four separate missions of planes flying from Mexico and unloading shipments of marijuana in the United States, and a fifth occasion when marijuana was alleged to have been flown from within the United States and received by co-conspirators. In the context of this case, it is inconceivable that the jurors would not have found that these substantive offenses were committed. The co-conspirators involved testified in detail as to these events and the evidence was overwhelming. The whole thrust of the defense by Hernandez was that he was not connected with the conspiracies. In reviewing the evidence and the final arguments of the attorneys, it is apparent that the concern was not with whether the flights with large amounts of marijuana had been made or the marijuana possessed for distribution; the arguments essentially concerned Hernandez' connection to this activity. With Hernandez' conviction of the two conspiracies, all of the substantive offenses committed by his co-conspirators could be attributed to Hernan-

stantial quantities of marijuana from a group of conspirators or invests in the group's marijuana

activities is not by these facts alone guilty of the continuing criminal enterprise offense."

dez. Under these circumstances, the jurors' unanimous agreement that Hernandez committed at least three violations of the federal narcotics law cannot seriously be questioned. Although it would have been the better practice to give a specific unanimity instruction, any error in this case was harmless.

Hernandez finally contends that the CCE instruction was flawed because it informed the jury that *only* conspiracies should be considered when determining whether Hernandez was guilty of a continuing series of violations. Because the defense did not object to the instruction on this ground in the trial court as required by Fed.R.Crim.P. 30,[6] our review is only for plain error. *See Anguiano,* 873 F.2d at 1319. Plain error will be found only if an error was highly prejudicial and there was a high probability that the alleged error materially affected the verdict; it is an exceptional remedy which we invoke only when it appears necessary to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process. *Id.* Only rarely will an improper jury instruction justify a finding of plain error. *Id.*

 The trial court instructed the jury that in order to convict Hernandez under section 848 it must find beyond a reasonable doubt "that these [narcotics] offenses were part of three or more offenses committed by the Defendant over a definite period of time in violation of the Federal narcotics laws which make it a crime to conspire to import and distribute marijuana." The language of the instruction does not actually limit the offenses constituting the series to conspiracies. It states that the offenses must be violations of the Federal narcotics laws. The only incompleteness is the statement that Federal narcotics laws make it a crime to conspire to import and distribute marijuana and not going on

to say they also make it a crime to import and distribute marijuana. It is difficult to believe that after three weeks of trial, the jury was not fully aware that the Federal narcotics laws also prohibit importation and distribution as well as conspiracy. In the context of the whole trial, it was clear that the other offenses specified in the indictment were to be considered. The indictment, which went to the jury room, specified those offenses. The Government counsel in his closing argument directed the jury's attention to the indictment, with reference to the series of offenses, stating:

> The Court will explain in detail exactly what that means, but a number of those alleged in the Indictment include the importation, the various loads, the flight in interstate or foreign commerce, going down to Mexico to pick up the loads is a substantive offense which may be included as part of that series.
>
> So once you have found the conspiracy you may legally attribute to the Defendant the acts of all the co-conspirators. In fact, the law requires that type of attribution.

The defense expressed no disagreement with this identification of the specified series of offenses at this stage, or at any other time during the trial.

We conclude that it was not highly probable that the jury was misled into believing that the Federal narcotics laws prohibited only conspiracies. We find no plain error.

## B. *The Credibility Instructions*

During trial, several government witnesses related statements made by non-testifying co-conspirators Frank Peacock and James Gahan. These statements, which implicated Hernandez in large-scale drug trafficking, were admitted pursuant to Fed. R.Evid. 801(d)(2)(E) and impeached by the defense as permitted by Fed.R.Evid. 806.[7]

---

**6.** Rule 30 provides in relevant part:
No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection. Opportunity shall be given to make the objection out of the

hearing of the jury and, on request of any party, out of the presence of the jury.

**7.** Rule 801(d)(2)(E) provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and

To aid the jury in the consideration of this evidence, the defense offered the following proposed jury instruction:

> Testimony has been offered in this case referring to out of court statements allegedly made by individuals whom the prosecution alleges were co-conspirators. You must first evaluate the credibility or believability of the witness who is relating the statement. You must also evaluate the credibility of the person who allegedly made the statement and who is not present in court. For example, in considering any statements by Mr. Peacock, you should evaluate his credibility in the same manner as if he were personally testifying in court. In addition to other factors, you should consider: (1) his character and/or reputation for truthfulness; (2) any dishonest act or conduct he may have committed; (3) any felony convictions; (4) his use of drugs; (5) whether his statements are supported or contradicted by other evidence; and (6) any other evidence bearing on credibility.

The district court, however, rejected the proposed instruction, stating that other instructions adequately covered the credibility issue. Hernandez contends that a major defense at trial was that the government's witnesses, including the hearsay declarants, were not credible. He thus argues that the district court's rejection of this instruction amounted to a refusal to instruct on the defendant's theory of the case.

■ Even if Hernandez' theory-of-the-case characterization is accepted, however, there is no error where, as here, the other instructions in their entirety covered the defense theory. *See Kenny*, 645 F.2d at 1337. In the present case, the district court judge gave a number of instructions dealing specifically with credibility. He began these instructions by noting that credibility issues had been extensively discussed by the parties. He then listed a number of factors the jury could consider in determining the credibility of witnesses, such as whether the witness was contradicted by other evidence. In addition, the district court gave special instructions to aid the jury in assessing the credibility of informants, accomplices, and immunized witnesses. Finally, the judge instructed the jury that a witness' testimony may be discredited or impeached by prior inconsistent statements, felony convictions, and reputation evidence tending to show that that witness' veracity was questionable. As the Government notes, "[u]nder these circumstances, it cannot reasonably be argued that the jury was misled by the trial court's failure to instruct them that the same credibility factors applied to Peacock and Gahan as to the witnesses who testified directly." This is especially true because defense counsel argued extensively in closing that Peacock and Gahan's credibility was suspect and should be evaluated by the standards delineated by the district court. We conclude that the jury was sufficiently informed on these matters and that the district court therefore did not commit error by refusing Hernandez' proffered instruction.[8]

■ Hernandez' second attack on the court's credibility instructions must also fail. He claims that the instructions were flawed because, although they informed the jury that the testimony of accomplices, informers, and immunized witnesses that was harmful to the defendant must be viewed with caution, they failed to indicate that the testimony of these individuals that was *favorable* to the defense need not be similarly scrutinized. Once again, we conclude that the instructions given by the

---

in furtherance of the conspiracy." *See generally Bourjaily v. United States,* 483 U.S. 171 (1987).

Under Rule 806, when such a statement "has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness."

**8.** We note that, even if it would have been advisable to give *an* instruction on the credibility of hearsay declarants, the instruction advanced by Hernandez was argumentative and singled out Frank Peacock in a way that could have led the jury to believe that the district court found Peacock's statements especially questionable. This was another reason for rejecting the instruction.

district court were adequate. With regard to informers, the court instructed:

"The testimony of an informer who provides evidence *against a Defendant* for pay or for immunity from punishment or for personal advantage or vindication must be examined and weighed by the jury with greater care than the testimony of an ordinary witness. The jury must determine whether the informer's testimony has been affected *by interest or by prejudice against the Defendant*" (emphasis added).

Similarly the jury was told to consider, in the case of testimony from an immunized witness, "[W]hether the testimony may be colored in such a way as to further the witness' own interest, for a witness who realizes he or she may procure his or her own freedom *by incriminating another* has a motive to falsify" (emphasis added). Finally, although not as explicit, the accomplice instruction told the jury that it should give accomplice testimony "such weight as [it] feels it should have." Thus, two of the three instructions expressly limited the cautionary language to testimony adverse to Hernandez. The absence of similar language in the third instruction could not seriously have misled or confused the jury, especially since the defense argued the point in closing. We conclude that the credibility instructions were adequate.

## C. *The Forfeiture Instruction*

Hernandez makes three arguments with regard to the forfeiture instruction. The first argument is that the court's instruction permitted an improperly expanded category of properties that could be subject to forfeiture. The second is that the forfeiture instruction indicated that the Government was required to prove its case by preponderance of the evidence instead of beyond a reasonable doubt. The third argument is that the instructions conflict with Fed.R.Crim.P. 31(e).

Count 8 of the indictments under which Hernandez was prosecuted alleges that various assets were subject to criminal forfeiture under 21 U.S.C. § 848(a)(2). Before trial, section 848(a) was amended, eliminating subsection (2) and instead referring to a new section 853, prescribing the basis for forfeiture. The forfeiture instruction given was based on section 853. We have previously held that the retroactive application of section 853, which was a part of the Comprehensive Crime Control Act of 1984, did not violate the Constitution's proscription against *ex post facto* laws. *United States v. Crozier*, 777 F.2d 1376, 1383 (9th Cir.1985).

### 1. *Category of Property Subject to Forfeiture*

■ Section 848(a)(2) prescribed the property subject to forfeiture in fairly general terms. It provided:

Any person who is convicted under paragraph (1) of engaging in a continuing criminal enterprise shall forfeit to the United States—

(A) the profits obtained by him in such enterprise, and

(B) any of his interest in, claim against, or property or contractual rights of any kind affording a source of influence over, such enterprise.

Hernandez contends that section 853(a)(1) expanded the category of property that could be reached. That section provides that the property subject to forfeiture is:

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

Although this specification of property subject to forfeiture is more precise, it does not expand the property reachable but merely defines it more accurately. The property described in section 853(a)(1) fits within the general description of the property subject to forfeiture in the former section 848(a)(2).

■ A second argument advanced by Hernandez is that section 853(c) expands the category of forfeitable property. That section provides, in essence, that all interest in forfeitable property as described in section 853(a) vest in the United States upon the completion of the act giving rise to forfeiture and that a subsequent transfer of the property to another person may

be subject to forfeiture. However, the section also provides for a method by which a third party, who holds an interest in the property, can establish at a subsequent hearing his or her interest in that property. Inasmuch as this section only reaches the forfeitable property as described in section 853(a), Hernandez' argument really only pertains to the interest of a third party. Hernandez has no standing to complain of any due process violation with regard to a third-party interest. That would be for the third party to contest if the occasion arises. We find no constitutional or statutory violation in the application of section 853 in this forfeiture proceeding.

### 2. *Burden of Proof Applicable*

Hernandez contends that the instruction given by the court erroneously required the Government to establish the forfeiture by a preponderance of the evidence. The pertinent portions of section 853 here in contention are as follows:

(a) *Property subject to criminal forfeiture*

Any person convicted of a violation of this subchapter ... shall forfeit to the United States, ...

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

. . .

(d) *Rebuttable presumption*

There is a rebuttable presumption at trial that any property of a person convicted of a felony under this subchapter or subchapter II of this chapter is subject to forfeiture under this section if the United States establishes by a preponderance of the evidence that—

(1) such property was acquired by such person during the period of the violation of this subchapter or subchapter II of this chapter or within a reasonable time after such period; and

(2) there was no likely source for such property other than the violation of

this subchapter or subchapter II of this chapter.[9]

The pertinent portion of the instructions in issue here are:

Now if you find the defendant guilty of Count Eight of the indictment you must then determine which of the properties, if any, listed in Count Eight is subject to forfeiture. Forfeiture means the defendant is to be divested or deprived of his ownership or interest, if any, in property as a penalty for engaging in a continuing criminal enterprise. Property is forfeitable if the Government proves by a preponderance of the evidence that the property was acquired by the defendant while he engaged in the continuing criminal enterprise, Count Eight, or within a reasonable time after, and with money or proceeds obtained directly or indirectly from the continuing criminal enterprise with no other likely source for obtaining such property.

This instruction combined, in a meaningful way, the presumption and the ultimate factual determination. If the jury found the predicate facts of section 853(d), it also had to be convinced by a preponderance of the evidence of the ultimate factual determination prescribed in section 853(a)(1), that the property be obtained directly or indirectly from the continuing criminal enterprise.

Further instructions defined preponderance of the evidence and cautioned the jury not to confuse the burdens of proof in this case. The court emphasized that when analyzing and discussing the guilt or innocence of the defendant charged in the four counts of the indictment, the Government must prove the defendant guilty beyond a reasonable doubt and that the only time the preponderance of the evidence standard was to come into play was with regard to this forfeiture provision.

■ Judge Weis, in a carefully reasoned Third Circuit opinion, *United States v. Sandini*, 816 F.2d 869 (3d Cir.1987), re-

---

**9.** Although section 853(a) delineates other categories of property subject to forfeiture in subsections (2) and (3), these sections are not an issue in this case because the instructions of the court limited the property subject to forfeiture to the property described in section 853(a)(1).

viewed the origins of this criminal forfeiture provision and the distinction between criminal and civil forfeiture. The opinion dealt with the precise problem raised here, and held that the applicable burden of proof for the forfeiture was proof by a preponderance of the evidence. As that court noted, it is constitutionally mandated that the elements of a crime be proved beyond a reasonable doubt, however forfeiture of property is not an element of the continuing criminal enterprise offense; it is an additional penalty prescribed for that offense. Thus, proof beyond a reasonable doubt is not constitutionally mandated. The wording of section 853(a) itself makes it clear that forfeiture is a part of the punishment and not an element of the crime. The provision states: "The court, in imposing sentence on such person, shall order, in addition to *any other sentence* imposed ... that the person forfeit to the United States all property described in this subsection." (Emphasis added.) It is clear that the statutory formulation provides that the forfeiture is additional punishment for the crime, not an element of the crime.

▮ Hernandez argues that even if the preponderance of the evidence standard is constitutionally permissible, section 853 did not provide that the ultimate burden of proof for the forfeiture was to be by a preponderance of evidence, but only that subsection (d) provided for a rebuttable presumption, which could be established by a preponderance of the evidence. The *Sandini* court considered and rejected this argument. *Id.* at 875. We agree.

Section 853 does not specifically state what the ultimate burden of proof is to be. It would make little sense, however, to provide for a rebuttable presumption that certain property is subject to forfeiture if facts relative to that property are established by a preponderance of the evidence, then move to a beyond-the-reasonable-doubt standard before the property could be forfeited. If the presumption is to mean anything, it must mean that if the presumption is not rebutted, then the forfeiture is established. The presumption would have no significance whatsoever if the prosecution were still required to prove the forfeiture beyond a reasonable doubt. As the *Sandini* court noted,

> The legislative history makes clear that Congress sought to make the Government's burden of proof in criminal forfeitures the same as that in the civil realm. Such a provision is valid to the extent that the forfeiture proceeding occurs only after a conviction based on the constitutional standard. The statute, moreover, does not shift the burden of persuasion—it remains with the prosecution. *Id.* at 876.[10]

### 3. *Conflict with Fed.R.Civ.P. 31(e)*

Hernandez next argues that the instruction is in conflict with Rule 31(e) of the Fed.R.Crim.P. and the commentary thereon. Subsection (e) to Rule 31 was added as an amendment in 1972 to provide a procedure for the forfeiture provisions of the various criminal laws. That section states:

> If the indictment or the information alleges that an interest or property is subject to criminal forfeiture, a special verdict shall be returned as to the extent of the interest or property subject to forfeiture, if any.

**10.** The *Sandini* case was cited with approval and followed in *United States v. Haro,* 685 F.Supp. 1468 (E.D.Wis.1988). In another district court case, *United States v. Pryba,* 674 F.Supp. 1518, 1520–21 (E.D.Vir.1987), the court disagreed with *Sandini's* reading of the legislative history. The principal criticism is that the legislative history cited the Supreme Court's decision in *Ulster County Court v. Allen,* 442 U.S. 140, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979), as support for the provision. The *Pryba* court stated that *Allen* held that a rebuttable presumption is constitutionally acceptable so long as the device does not undermine the factfinder's responsibility at trial to find the ultimate facts beyond a reasonable doubt. However, the *Allen* case was dealing with the establishment of elements of a crime. Thus, it is plain that the ultimate standard had to be proof beyond a reasonable doubt. The purpose for which the *Allen* case was cited in the legislative history was the discussion at 442 U.S. 157, 99 S.Ct. at 2224, that the rebuttable nature of the presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof. Thus, the point is that a rebuttable presumption is permissible whereas a conclusive presumption would not be.

We find no inconsistency between the instructions given, which were derived from section 853(c), and Rule 31(e). The "extent of the interest or property subject to forfeiture," which is to be found in a special verdict, under Rule 31(a) would, under section 853(c) and the instruction, be the forfeitable property in which Hernandez had an interest. The right, if any, of third parties to the property can be established in a subsequent hearing.

A second problem raised by Hernandez in connection with Rule 31(e) is the commentary, which provides: "The assumption of the draft is that the amount of the interest or property subject to criminal forfeiture is an element of the offense to be alleged and proved." First we note that is merely an assumption of the advisory committee and does not form any part of the rule. Enactment of section 853 clarifies congressional intent that the forfeiture is not an element of the crime but rather a part of the punishment and thus the assumption in the commentary is simply incorrect.

## IV.

### ADMISSIBILITY OF MIRANDA TESTIMONY

As a witness for the Government, Jose Miranda testified at trial about his involvement with Hernandez' drug trafficking operation during the 1970s. According to Miranda, the two men met in the early seventies when Miranda, a construction worker, did some remodeling work for Hernandez in Tucson, Arizona. Miranda soon became an errand boy for Hernandez, delivering samples to interested parties and cleaning the marijuana residue from vehicles. By the mid-seventies, he was driving loads of marijuana at Hernandez' request. Miranda further testified that, during the latter half of the decade, he broke off his relationship with Hernandez for several years. He did, however, agree to transport one final load of marijuana in the late seventies. Pursuant to this agreement, he flew to Los Angeles with Hernandez, later driving the marijuana back to Tucson in a U–Haul truck.

At trial, Hernandez objected to the admission of Miranda's testimony on the ground that it was irrelevant to the offenses for which he was being tried. He now reiterates this claim on appeal. We review a district judge's determinations regarding the admissibility of evidence for abuse of discretion. *See United States v. Hernandez*, 876 F.2d 774, 777 (9th Cir. 1989) (citing *United States v. Gwaltney*, 790 F.2d 1378, 1382 (9th Cir.1986), *cert. denied*, 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987)).

■ Hernandez' relevancy challenge is easily resolved. One of the crimes for which he was tried was engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. As we have previously stated, in order to establish a violation of section 848, the Government must prove that a defendant has committed a continuing series of narcotics violations. *See* section IIIA, *supra*. Although Hernandez' drug-related exploits from the 1970s were not specifically listed in the indictment as potential CCE predicate offenses, this court has held that narcotics violations need not be expressly mentioned in an indictment before they can be considered by the jury to satisfy section 848's continuing series requirement. *See Sterling*, 742 F.2d at 526. In *Sterling*, for instance, the defendant was charged with numerous drug-related offenses stemming from his participation in a large scale marijuana smuggling operation centered in Bellingham, Washington during 1981. Although the indictment focused on the Bellingham incident and the majority of the evidence at trial consisted of testimony of individuals involved in that scheme, government witnesses also testified about the defendant's involvement in other drug operations dating back to 1971. *Id.* at 523. We concluded that it was entirely proper for the jury to consider the defendant's earlier drug activities when determining whether section 848's continuing series requirement had been met. *Id.* at 526.

We see no meaningful difference between the facts of *Sterling* and the circum-

stances of this case. The district court did not abuse its discretion when it admitted the testimony of Jose Miranda.

## V.

### JURY CONSIDERATION OF EXTRINSIC MATERIAL

On August 20, 1986, a jury found Hernandez guilty on all counts. Hernandez now urges that the jury's verdict was tainted by the jurors' exposure to extrinsic matters during the course of their deliberations. First, Hernandez maintains that the jurors were improperly influenced by a "sign from God." Second, Hernandez claims that the jurors' inadvertent receipt in the jury room of some notes implicating him in the death of his girlfriend irrevocably prejudiced the verdict. We reject each of these claims.

### A. *Sign from God*

After the verdict was returned, Hernandez filed a motion for new trial based upon the affidavit of Audrey Giles, one of the jurors in the case. In her affidavit, Giles states that on the final morning of the jury's deliberations one of the other jurors commented that she hoped a third, unnamed juror would wear his blue blazer that day. After the jury reached its verdict, Giles was told the following: (1) that one of the jurors had prayed to God that another juror, Walter Geudtner, would change his vote from not-guilty to guilty; (2) that this juror had asked for and received a sign from God that her prayers had been heard and that Mr. Geudtner would change his vote; and (3) that the sign would be that Mr. Geudtner would be wearing his blue blazer to court on a particular day. Hernandez claims that the introduction of this "sign from God" into the

jury deliberations impermissibly tainted the verdict. He asked for an evidentiary hearing so that this matter could be explored further, but the district court denied his request.

"A defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during trial if there is 'a reasonable possibility that the extrinsic material *could* have affected the verdict.'" *Dickson v. Sullivan*, 849 F.2d 403, 405 (9th Cir.1988) (quoting *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir.1987)) (emphasis in *Marino*). Rule 606(b) of the Federal Rules of Evidence, however, prohibits the use of juror testimony to impeach a verdict when that testimony relates to *intrinsic* matters—that is, the internal, mental processes by which the verdict was reached. *See Tanner v. United States*, 483 U.S. 107, 116–127, 107 S.Ct. 2739, 2745–51, 97 L.Ed.2d 90 (1987).[11] Whether the juror was literally inside or outside the jury room when the irregularity occurred has no bearing on the determination that a particular influence was external or internal. *Id.* at 117, 107 S.Ct. at 2746.

■ In the present case, the district court did not err in refusing to hold an evidentiary hearing on the sign-from-God matter. All that has been alleged is that one of the jurors used prayer and a belief in a sign from God as part of her mental process. Nothing in the declaration indicates that any of the other jurors were told or became aware that a sign from God would be manifested in one juror's wearing a blue blazer while they were still deliberating. Thus, the affidavit does not establish that the verdict was improperly influenced by an extrinsic matter. In such circumstances, an evidentiary hearing was unnecessary.

**11.** Rule 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

## B. *The Rush Notes*

■ Hernandez contends that he should be granted a new trial on the ground that the jury considered notes that were not part of the record and contained prejudicial information about him. This contention has no merit.

On the third day of deliberations, the jury sent a note to the judge asking whether they were allowed to consider certain documents that were not discussed in court. The documents consisted of several pages of handwritten notes made by one of the government's witnesses, Olga Rush, in preparation for testifying at the trial. The notes created a possible inference that Hernandez could have been implicated in the death of his former girlfriend, Rosemary Rosales.[12] Early in the trial, the judge had specifically ruled that no evidence was to be presented regarding Rosales' death.

Upon determining that the documents about which the jury had inquired were not properly before the jury, the judge instructed the jury, "To the extent that any of you have looked at [this document], at this time I'm ordering that that will be stricken from the record. I admonish you to disregard any of that information. It has no relevance whatever to any issue before the jury." The judge denied Hernandez' motion for a mistrial. The jury then continued its deliberations for a few more hours before returning a guilty verdict. Hernandez renewed his motion for a mistrial, which the court denied.

This court reviews de novo a trial court's refusal to grant a mistrial, being mindful of the trial court's conclusion about the effect of extrinsic evidence seen by the jury. *United States v. Brodie,* 858 F.2d 492, 495 (9th Cir.1988). "A defendant is entitled to a new trial when the jury obtains or uses evidence that has not been introduced during trial if there is 'a reasonable possibility that the extrinsic material *could* have affected the verdict.'" *Dickson v. Sullivan,* 849 F.2d 403, 405 (9th Cir.1988) (quoting *Marino v. Vasquez,* 812 F.2d 499, 504 (9th Cir.1987)). The state has the burden of proving that the exposure to the evidence was harmless beyond a reasonable doubt. *Dickson,* 849 F.2d at 406.

There are several factors which have been identified as relevant to determining whether the state has successfully rebutted the presumption of prejudice arising from the introduction of extrinsic evidence. *Id.* They are:

> (1) whether the material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the juror discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and (5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Id.* (quoting *Marino,* 812 F.2d at 506). No one of these factors is dispositive in any given case. *Id.*

This court has also noted in the past that reversible error has been found where there is a direct and rational connection between the extrinsic evidence and a prejudicial jury determination, and where the material considered by the jury relates to a material aspect of the case. *Marino,* 812 F.2d at 506; *United States v. Bagnariol,* 665 F.2d 877, 885 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). We have also considered whether curative instructions were given, noting that although we ordinarily assume that such an instruction will insure that the inadmissable evidence will not influence the jury, that assumption is subject to serious doubt where the extrajudicial statement concerns a defendant's prior criminal acts. *See Dickson,* 849 F.2d at 408. Finally, we have considered the length of jury deliberations before and after the extrinsic evidence was considered. *See Marino,* 812 F.2d at 506.

---

**12.** The following portions of the notes are relevant:

"ROSEMARY LOUISA ROSALES ... BORN 6–3–52, DIED 9–3–81.... Was murdered in Monterey Park on September 3, 1981.... Jan. 1979 Rosemary came back talked about almost being killed in Mexico by Don [Hernandez] and him having a hole dug for her."

In the case before us, it is not entirely clear that any of the jury members actually considered or was even aware of the contents of the notes. By bringing the notes to the court's attention, they policed themselves so as to minimize their exposure to extrinsic evidence. Furthermore, the contents of the notes were not relevant to any issue in the case before the jury. Finally, the judge gave a curative instruction immediately upon determining that extrinsic evidence had been in the jury room and before the jury continued its deliberations. These factors combined lead us to conclude that there is no reasonable possibility that the jury's verdict was influenced by their exposure to the extrinsic evidence.

## VI.

## RECUSAL

Prior to trial, the Government moved to detain Hernandez on the ground that his continued liberty posed a danger to the community. While this motion was pending, an unidentified individual—affiliated with neither the defendant nor the Government—contacted District Judge Irving with information regarding Hernandez' dangerousness. Although the judge informed the parties that he had been contacted, he refused to disclose the substance of the interview. Instead, he placed the evidence under seal.

Hernandez moved to disqualify Judge Irving from further involvement in the case based upon the judge's *ex parte* receipt of this potentially prejudicial information. Judge Irving concluded, however, that the circumstances did not warrant his recusal. We review this decision for abuse of discretion. *See United States v. Hamilton,* 792 F.2d 837, 839 (9th Cir.1986).

■ Recusal is appropriate pursuant to 28 U.S.C. §§ 144, 455 if "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Studley,* 783 F.2d 934, 939 (9th Cir.1986) (citations omitted). In order to state a successful case for recusal, however, a party must allege bias or prejudice stemming from an extrajudicial source. *Id.; Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec,* 854 F.2d 1538, 1548 (9th Cir.1988) [hereinafter *Nilsson* ]. Further, the bias or prejudice must "result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Azhocar,* 581 F.2d 735, 739 (9th Cir.1978) (emphasis and citation omitted), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979). Hernandez' allegations fail to meet either of these threshold requirements.

District courts have the inherent power to receive *in camera* evidence and place it under seal in appropriate circumstances. *See United States v. Mann,* 829 F.2d 849, 853 (9th Cir.1987). The district judge received the information as relevant to the bail proceedings that were properly pending before him. His decisions regarding how the matter should be handled and the extent to which the evidence should be relied upon were all made during the course of these proceedings and were thus judicial acts. *Compare Nilsson,* 854 F.2d at 1548 ("[t]he grounds alleged by defendants are not extrajudicial since they involve the judge's performance while presiding over the case").

Moreover, Hernandez has pointed to no particular actions of the judge to support his allegations of bias except the district judge's sentencing decision. We find Hernandez' argument that his sentence was improperly influenced meritless,[13] and will

---

**13.** Hernandez was sentenced to 40 years on the CCE charge and received concurrent 5, 15, and 5-year terms on the three conspiracy charges. He claims that the magnitude of this sentence shows that the trial judge was prejudiced against him by the *in camera* information the judge considered during the course of his bail proceedings. We note first that the sentence was within the statutory limits, *see United States v.*

*Stewart,* 820 F.2d 1107, 1108 (9th Cir.) (a sentence within the statutory limits is generally not subject to appellate review), *cert. denied,* 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987); *see also* 21 U.S.C. § 848 (authorizing life imprisonment). In addition, others have been sentenced to comparable or even harsher penalties in similar circumstances. *See, e.g., Stewart,* 820 F.2d at 1107–08 (defendant sentenced to life

not infer bias simply on the basis of the judge's exposure to potentially inflammatory information. In *United States v. Lee*, 648 F.2d 667, 669 (9th Cir.1981), the appellant argued that the trial court's *in camera* exposure to "volatile and inflammatory" documents must necessarily have affected the district court's sentencing decision. We dismissed the argument, stating: "The very nature of the judicial function calls upon judges to rise above impermissible influences." *Id.* Our review of the record indicates nothing other than that the district judge did so in this case. Refusal to grant Hernandez' recusal motion was not an abuse of discretion.

## VII.

## DOUBLE JEOPARDY

■ The court imposed concurrent sentences for the two drug conspiracy charges and the CCE charge. The appellant contends that the double jeopardy clause precludes the imposition of these concurrent sentences. In *United States v. Burt*, 765 F.2d 1364, 1368 (9th Cir.1985), we considered the lesser included offense implications involved in conspiracy charges under section 846, and the CCE charge under section 848. We discussed the result of the Supreme Court's decision in *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), and the later case of *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). In *Burt*, we vacated the section 846 conspiracy sentences which ran consecutively to the section 848 CCE sentence. It is clear from *Jeffers* that Congress did not intend to allow cumulative punishment for violations of section 846 conspiracies and the greater offense of a section 848 CCE violation.

*Jeffers*, 432 U.S. at 155, 97 S.Ct. at 2218. The remedy required is for the district court to vacate the convictions under Counts One and Two for the conspiracies in violation of section 846. Once it is determined that Congress did not intend cumulative punishment for the section 846 violations and the section 848 violation, the only remedy consistent with the congressional intent is for the sentencing court to vacate the convictions for the lesser offenses. *Ball v. United States*, 470 U.S. 856, 864–65, 105 S.Ct. 1668, 1673–74, 84 L.Ed.2d 740 (1985).[14] The fact that the sentences for these offenses were to be served concurrently with the CCE sentence still constitutes cumulative punishment. "The separate *conviction*, apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored." *Id.* at 865, 105 S.Ct. at 1673–74.

### Conclusion

The conviction and the forfeiture under the CCE charge in Count One is affirmed. The conviction for conspiracy to travel in interstate and foreign commerce in aid of a recapturing enterprise, Count Three, is also affirmed. The case is remanded for vacation of the convictions under Counts One and Two, for conspiracies in violation of section 846.

AFFIRMED IN PART and REMANDED.

---

without possibility of parole on CCE charge); *Sterling*, 742 F.2d at 523 (40 years without the possibility of parole). Given the evidence presented at trial, Judge Irving's sentencing decision suggested no impermissible prejudice.

**14.** Although the *Burt* decision required only vacation of the sentences, the Supreme Court in its

*Ball* decision, decided the same year, requires vacation of the convictions.